CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 1 9 2010

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| **FRED LEWIS WILSON,** | ) |
| | ) |
| **Plaintiff,** | )    Case No. 7:10CV00237 |
| | ) |
| **v.** | ) |
| | )    **MEMORANDUM OPINION** |
| | ) |
| **C/O STALLARD, ET AL.,** | )    By: **Glen E. Conrad** |
| | )    **Chief United States District Judge** |
| **Defendants.** | ) |

Plaintiff Fred Lewis Wilson, a Virginia inmate, has filed this civil rights action, pursuant to 42 U.S.C. § 1983, with jurisdiction vested under 28 U.S.C. § 1343. In his complaint and numerous supporting documents, Wilson alleges that the defendant correctional officers retaliated against him for filing previous civil actions against prison officials by planting a homemade weapon in his cell in order to bring false charges against him; by assaulting him during the removal of his handcuffs; and by destroying several of his magazines. He has also filed a motion to amend to add administrative prison officials for allegedly failing to respond reasonably to his previous complaints that correctional officers were retaliating against him. He seeks monetary damages for these past actions and moves for a temporary restraining order. Upon review of the record, the court finds it appropriate to grant the motion to amend, but determines that the complaint as amended must be summarily dismissed.

# I. Background

Liberally construing the complaint and the many documents submitted as exhibits, Wilson alleges the following sequence of events on which he bases his claims. During the breakfast service in the segregation unit at Red Onion State Prison on February 7, 2010, Correctional Officers Stallard and Everidge came to Wilson's cell to pick up his breakfast tray. They accused him of putting bodily waste on the tray and threatened that he would get more prison time. Wilson denied any such conduct and accused the officers of retaliating against him, because he had previously filed civil rights actions against prison officials at Red Onion and at Wallens Ridge State Prison and because a state investigator had interviewed him two days earlier about other complaints he had raised concerning the conduct of correctional officers.

Later that morning, at approximately 8:30 a.m., Stallard and Everidge came to Wilson's segregation cell to conduct a "random" shakedown. They removed Wilson from the cell and searched it for contraband, while another officer recorded the procedure with a handheld video camera.[1] Wilson noticed that the officers were all wearing their name tags upside down. During the search, from his position outside the cell, Wilson saw Stallard lift the mattress and plant and then "discover" a homemade weapon. Stallard also removed three newspapers (USA Today) and two church magazines (the Philadelphia Trumpet) from Wilson's cell and threw them in the

---

[1] Wilson explains that the video camera was present to videotape the shakedown procedure, pursuant to a standing order that officers must videotape any procedure involving the opening of Wilson's tray slot or his removal from his cell. He states that this order was put into effect while he was housed at Wallens Ridge State Prison in 2007, where he accused officers there of assaulting and retaliating against him. He complains that on numerous occasions, officers have failed to videotape the opening of his tray slot in compliance with the order. (See Docket Entry (DE) 28.)

trash, without giving a confiscation notice as required by prison procedures governing inmate's property.[2]

After completion of the cell search, Wilson reentered the cell, and officers removed his shackles before leaving the cell and closing the door. Wilson backed up to the tray slot in the door to allow officers to remove the handcuffs from his wrists. Ordinarily, a "shakedown box" mounted over the tray slot on the outside of the door during cell searches would be removed before officers take the inmate's handcuffs off. On this day, the shakedown box was still mounted on the door when officers ordered Wilson to back up to the door and place his hands through the slot for removal of the cuffs. After Everidge removed the left cuff, he clamped down hard on the right cuff, causing it to dig into Wilson's right wrist. Wilson turned to face the door, shouting that Everidge was hurting him. Everidge accused Wilson of grabbing his hand, which Wilson denied doing. Everidge then utilized a "wrist lock," which allegedly caused a cut to Wilson's right wrist. The shakedown box shielded all of this action from the view of the video camera. Sgt. Trapp, who was supervising the shakedown, ordered Wilson to turn around so the decuffing procedure could be completed. When the cuffs were finally removed, Wilson held his right wrist in front of his cell window to show the officers what he characterizes as a two-inch cut to that wrist.

Wilson sought medical treatment for the cut. Medical records attached to his complaint indicate that upon examining Wilson on February 7, 2010 at 9:00 a.m., the nurse observed a

---

[2]  When Wilson filed a grievance concerning the removal of his reading materials on February 7, 2010, the responses indicated that officers properly removed these materials because Wilson had an excess number of periodicals in his cell, in addition to the most recent issue. The grievance was ultimately deemed "founded," however, because the officers should have written a confiscation notice, since Wilson was not charged with possession of the reading materials as contraband. (DE. 1, pp. 39-43.)

small laceration to his right wrist with a small amount of bleeding and a small amount of swelling and discoloration on the knuckle of his index finger. She also noted that Wilson was able to move the finger slowly. She advised him to wash the cut with soap and water and keep it covered with a band-aid. She also advised Wilson to keep taking Motrin, a medication already prescribed to him for another medical condition, and placed him on the list to see a doctor. At 2:35 p.m. that day, a nurse on pill pass noted that the swelling on Wilson's hand had increased. She advised him to continue taking his Motrin. A medical note from February 9, 2010 indicates that the cut on Wilson's wrist was scabbed and the skin was broken, but that he had no other skin breaks, although the hand remained swollen. The note also indicates that Wilson would be prescribed an antibiotic medication, Keflex, for one week.[3] Wilson claims that the injury has left a large, permanent scar on his wrist and that he suffered mental trauma for which he sought mental health treatment.

Stallard filed a written report stating that he had found the sharpened piece of metal tied in Wilson's bed sheet on February 7, 2010. Wilson denied possession of the weapon and accused Stallard of planting it. He demanded that officials conduct tests on the weapon for fingerprints and DNA comparison. Officers brought disciplinary charges against Wilson for assault and for possession of a weapon. Wilson claims that the potential penalty for these offenses was loss of all his earned good conduct time, which would have resulted in a longer term of confinement. On February 8, 2010, an investigator also informed Wilson that officials planned to bring criminal charges against Wilson related to the February 7, 2010 incident.

---

[3] Keflex is a semisynthetic cephalosporin antibiotic medication, taken by mouth, which is used for the treatment of skin infections, among others. See RxList: The Internet Drug Index, Keflex, 1-2 (Aug. 16, 2010), http://www.rxlist.com/keflex-drug.htm.

Wilson claims that he would have been charged with possession of an instrument capable of injury, in violation of Va. Code § 53.1-203, and possession of an instrument to aid escape, in violation of Va. Code § 53.1-203.3, both Class 6 felonies. On February 12, 2010, however, the investigator told Wilson that the disciplinary charges stemming from the incidents on February 7, 2010 had been dismissed, and the record does not indicate that officials filed any criminal charges against Wilson as a result of this incident.

Stallard admitted to investigators that he had planted the weapon in Wilson's cell because Wilson had filed previous civil rights actions against prison officials. Wilson states that Stallard's admission also led to dismissal of prior criminal charges pending against Wilson in the Wise County Circuit Court.[4]

Wilson himself filed a criminal complaint in the Wise County General District Court against Stallard for planting the weapon in his cell.[5] The magistrate returned the complaint to him on April 29, 2010, advising him that it failed to state the facts on which Wilson based his charges. Wilson also filed inmate complaints, asking that criminal charges be brought against Stallard. The record does not indicate that Wilson's criminal complaint against Stallard has gone

---

[4] These criminal charges arose from an altercation between Wilson and prison officials at Wallens Ridge State Prison on November 3, 2007. Wilson faced the following charges: Case No. CR08F00617-00 and -01, two counts of felonious assault of an officer, in violation of Va. Code § 18.2-57(c), Class 6 felonies; and Case No. CR08F00617-002, giving a false report to law enforcement officials, in violation of Va. Code § 18.2-461, a Class 1 misdemeanor. At a hearing in the cases on February 15, 2010, Wilson's attorney informed the court of Stallard's statement that he had planted the weapon because of Wilson's prior civil actions. Thereafter, on April 6, 2010, the three pending charges were nolle prossed.

[5] Wilson filed an informal complaint and grievance, the first two steps of the Virginia Department of Corrections (VDOC) administrative remedies procedure, accusing Stallard of planting the weapon and falsely reporting that he had found it in Wilson's cell in order to have charges brought against Wilson in retaliation for Wilson's pursuit of prior legal actions against prison officials. The Level I response to the grievance deemed it to be "founded," and this finding was upheld at Level II, the final level of appeal for the grievance.

forward. However, a VDOC investigator testified at a federal court proceeding in June 2010 that prison administrators had disciplined Stallard, and the officer is no longer employed by the VDOC.

According to Wilson, he suffered many other "retaliatory" actions, both before and after Stallard's misconduct, including the following, for example: a) false accusation from officers that Wilson attempted to spit on them on November 3, 2007;[6] b) on August 5, 2009, Officer Mullins planted or placed "a brass chit from [a] security key ring" in Wilson's cell, which Wilson found and mailed to VDOC Director Gene Johnson; the next day, officers conducted a two-hour shakedown of Wilson's cell;[7] c) on December 31, 2009, officers made loud noises intended to prevent Wilson from sleeping for several hours; then, after being made to wait until last to shower, officers gave Wilson a used razor, forced him to wait 15 minutes for a new one, turned off the water after he was soaped up, and then forced him to rinse in cold water; later, one of these officers aimed a video camera at Wilson's cell, shouted "degrading names" at him for 15 minutes, and told other inmates in the unit that Wilson was a child molester;[8] d) when Wilson complained of a severe toothache and chest pains on January 22, 2010, no one responded to his

---

[6] This allegation was first raised in Wilson's prior lawsuit, Case No. 7:08CV00638, in which it was dismissed without prejudice based on Wilson's failure to exhaust administrative remedies as required under 42 U.S.C. § 1997e(a). The girlfriend of one of the officers involved in bringing those charges signed an affidavit on Wilson's behalf, stating her belief that the spitting charge was retaliatory. As discussed, the November 3, 2007 incident resulted in the criminal charges which were ultimately dismissed in April 2010.

[7] In response to Wilson's informal complaint about this incident, Lt. Blevins stated that Officer Mullins had reported to his supervisor that he had lost a chit from his pocket.

[8] Wilson's grievance about the December 31, 2009 incidents was deemed founded, based on an officer's failure to respond to the inmate's informal grievance. (DE 18, pp. 13-15.)

emergency grievance;[9] e) on January 19, 2010, when Wilson's laundry was returned to him, someone had replaced his white sheets with a stained one containing a wad of chewing gum; f) on February 8, 2010, an officer threatened that Wilson would die in Wise County; and g) on February 9, 2010, one officer made comments that Wilson interpreted as homosexual, and another stepped on Wilson's clean bed sheet, leaving a stain of red juice from a puddle he had stepped in, refused to provide Wilson with a clean sheet, and messed up his legal materials. Wilson asserts that he has 1500 pages of exhibits to document his claims that dozens of officers at Red Onion have undergone a continuing "campaign of harassment" and retaliation against him since he started filing civil actions about prison conditions in 2008. (See, e.g, DE 14, 16, 34.) He faults supervisory prison officials for failing to take action to prevent the continuation of this "campaign."

Liberally construed, Wilson's many scattered submissions in this case allege the following grounds for relief:

1. On February 7, 2010, Officer Stallard planted a homemade weapon in plaintiff's cell in order to have false disciplinary charges and criminal charges brought against plaintiff in retaliation for plaintiff's pursuit of a prior lawsuit against prison officials, in violation of the First Amendment and other law;[10]

2. Officer Everidge used excessive force against plaintiff during handcuff removal procedures on February 7, 2010;

---

[9] Wilson stated in the emergency grievance that he believed he was having a "slight stroke due to stress from threats and reprisals from officers who have said they are out to get me for filing civil suits." (DE 18, p. 10.) He admits, however, that his chest stopped hurting and he did not have a stroke. When he filed grievances concerning the lack of response to his emergency grievance, his complaint was deemed "founded."

[10] Wilson also asserts that Stallard's actions give rise to claims of denial of access to the court, abuse of authority, malfeasance, abuse of process, vindictive prosecution, discrimination/equal protection, deprivation of a liberty interest, and "criminal acts."

3.    On February 7, 2010, Officer Stallard took three magazines from Wilson's cell, two of which were religious publications, and threw them away, contrary to prison policy requiring him to give Wilson a confiscation notice and an opportunity to appeal the confiscation;

4.    Supervisory prison officials have acted with deliberate indifference to Wilson's safety by ignoring or not properly investigating and/or responding to Wilson's many written complaints to them, through the inmate grievance procedure, asserting that correctional officers have taken multiple, adverse actions to harass him in retaliation for his pursuit of civil actions and grievances.[11]

## II. Discussion

To state a cause of action under § 1983, a plaintiff must establish that he has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42 (1988). A complaint filed by an inmate challenging the conduct of an "officer or employee of a governmental entity" may be dismissed under § 1915A(b)(1) if the complaint is "frivolous, malicious or fails to state a claim upon which relief may be granted." The factual allegations in the complaint, taken in the light most favorable to the plaintiff, must contain "more than labels and conclusions" and must be sufficient to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal,

---

[11]  Wilson raises this claim in a motion to amend, which will be granted. He brings Claim 4 against Warden Tracy Ray; Major L. Fleming; Regional Director John Garman; and Investigator Tony Adams. Wilson seeks to incorporate by reference all allegations of retaliation from his prior civil rights actions—as support for his claim of retaliation against Officer Stallard and in support of Claim 4 against supervisory officials. See Case Nos. 7:08CV00638, 7:09CV00503, 7:09CV00375, and 7:09CV00419.

__U.S.__, 129 S. Ct. 1937, 1940 (2009). After a review of Wilson's allegations as amended, the court concludes that he fails to allege facts stating any plausible claim actionable under § 1983.

## A. Retaliation

Retaliation against an inmate for the exercise of his right to access the courts states a claim. Hudspeth v. Figgins, 584 F.2d 1345, 1348 (4th Cir. 1978). To state a prima facie claim of retaliation under § 1983, an inmate must allege facts showing that he "suffered some adversity in response to [his] exercise of [constitutionally] protected rights." American Civil Liberties Union v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993). More specifically, he must show that his exercise of a constitutional right was a substantial factor motivating a retaliatory action and that the retaliatory action caused him more than de minimis inconvenience in exercising his constitutional rights. Id. at 785; see, e.g, id. at 786 (withdrawal of accommodation for ACLU paralegals visiting inmates, in response to a lawsuit, was not sufficient adverse impact on ACLU to state retaliation claim, since warden always had ability to restrict such access); Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) (finding that in order to state claim for retaliation, inmate must show that the alleged retaliation had an adverse impact on exercise of his constitutional rights); Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir.1996) (finding that inmate must "identify an actual injury resulting from official conduct," and "trivial claims of deprivation" are not actionable); Lingo v. Boone, 402 F. Supp. 768, 775 (N.D. Calif. 1975) (holding that inmate's "litigious history . . . belie[d] his contention that his right of access to the courts ha(d) been obstructed" by guard's threats of future harm in retaliation for his pending lawsuit).[12]

---

[12] But see Hudspeth, 584 F.2d at 1348 (finding that verbal threat of fatal harm to a prisoner litigator, coupled "with action apparently designed to carry out the threat," might constitute sufficient adverse impact to support § 1983 retaliation claim).

Such retaliation is actionable even if the retaliatory act would have been proper if taken for different reasons. Id. (citing Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977)). The plaintiff must allege specific facts supporting all elements of his claim of retaliation; bare assertions of retaliation do not establish a claim of constitutional dimension.[13] Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994); Cochran, 73 F.3d at 1318 ("[An] assortment of vague accusations [of conspiracy and retaliation] fails to demonstrate, as is required, that each retaliatory act violate[s] some constitutional right of an inmate or constitute[s] punishment for the exercise of a constitutional right.").

Taking Wilson's allegations and evidence in the light most favorable to him, the court concludes that he fails to allege facts on which the court could find all the required elements of an actionable § 1983 claim of retaliation against Stallard. While the retaliatory motive element is met by Wilson's evidence that Stallard admitted to planting the weapon to get back at Wilson for his litigation efforts against prison officials, the adverse impact element of the claim is lacking. Even assuming that Stallard planted the weapon with the intention to punish Wilson for his lawsuits by having him charged with disciplinary and criminal offenses, this plan did not come to fruition. Within days after the February 7, 2010 incident, prison officials' investigation of the matter resulted in their dismissal of all disciplinary charges placed against Wilson. No criminal charges were ever brought related to the incident. In fact, partly because of Stallard's admission and the ensuing investigation, pending criminal charges stemming from an incident in 2007 at Wallens Ridge were dropped. Threats of criminal or disciplinary charges that are immediately

---

[13] Claims of retaliation by inmates are generally treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds to prisoner misconduct." Cochran, 73 F.3d at 1317.

- 10 -

proven to be empty threats cannot satisfy the required showing of actual injury from the retaliatory conduct. Nor can Wilson's self-generated and self-diagnosed mental distress over those empty threats satisfy this element of his retaliation claim.

Similarly, Wilson's evidence does not indicate that Stallard's actions had any actual negative effect whatsoever on Wilson's ability to pursue his pending lawsuits and appeals or to file new lawsuits.[14] One of his lawsuits that was pending in February 2010, Case No. 7:08CV00638, thereafter proceeded to a jury trial in June 2010. Even before the trial in that case, Wilson filed this civil action and has vigorously pursued it. In addition, he is currently pursuing four appeals in past prisoner civil rights cases. As he fails to offer any evidence that Stallard's action adversely impacted his ability to exercise his constitutional right to access the courts, Wilson fails to present factual support for that necessary element of his § 1983 retaliation

---

[14] The court's docket indicates that Wilson has filed the following civil actions and appeals in addition to this case: Wilson v. Hall, Case No. 7:09CV00503 (W.D. Va. May 20, 2010) (§ 1983 action, summary judgment granted for defendant), appeal docketed, No. 10-6858 (4th Cir. June 21, 2010); Wilson v. Ray, Case No. 7:09CV00418 (W.D. Va. October 27, 2009), appeal docketed, No. 09-8016 (Nov. 4, 2009); Wilson v. Coleman, Case No. 7:09CV00325 (W.D. Va. Sept. 24, 2009) (§ 1983 action dismissed under 28 U.S.C. § 1915A(b)(1) for failure to state a claim), appeal docketed, No. 09-7896 (4th Cir. Oct. 15, 2009); Wilson v. VA VDOC, Case No.7:09CV00124 (W.D. Va. Oct. 13, 2009) ( § 2254 habeas petition dismissed as untimely); Wilson v. VA VDOC, Case No.7:09CV00126 (W.D. Va. Oct. 13, 2009) (same); Wilson v. VA VDOC, Case No.7:09CV00127 (W.D. Va. Oct. 13, 2009) (same); Wilson v. Collins, Case No. 7:08CV00638 (W.D. Va. June 25, 2010) (§ 1983 action, summary judgment as to some claims, jury verdict for defendants as to remaining claims), appeal docketed, No. 10-6949 (4th Cir. July 13, 2010); and Wilson v. Sprinkle, Case No. 7:08CV00427 (W.D. Va. July 30, 2008) (§ 1983 action against local jail officials and court appointed counsel, construed and dismissed without prejudice as an unexhausted habeas corpus petition, pursuant to 28 U.S.C. § 2254).

claim.[15] Cochran, 73 F.3d at 1317. Accordingly, the court will summarily dismiss the retaliation portion of Claim 1.[16]

Wilson's attempts to characterize Stallard's actions as violating other federal rights also fail. Wilson's failure to demonstrate actual injury to his litigation efforts resulting from Stallard's act forecloses any claim that Stallard interfered with his constitutional right to access the court. See Lewis v. Casey, 518 U.S. 343, 351 (1996) (finding that denial of access claim requires showing that inmate was unable to file the initial complaint or that a complaint he filed was so technically deficient that it was dismissed without consideration of the merits). Moreover, Wilson has no constitutional right to insist that Stallard be criminally prosecuted for his actions. The right to access the courts involves only the right to "enforce personal rights in civil litigation." Lopez v. Robinson, 914 F.2d 486, 494 (4th Cir. 1990). Individual citizens have no right to have governmental authorities institute a criminal investigation or prosecution of anyone. See Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973). Therefore, the fact that prison

---

[15] Wilson also asserts that Stallard's act constituted "discrimination" in violation of the Equal Protection Clause of the Fourteenth Amendment. However, Wilson fails to explain how Stallard's act constituted unequal treatment of Wilson, compared to his treatment of some unspecified group of similarly situated inmates. As unequal treatment of similarly situated individuals is the gravamen of an equal protection or discrimination claim, Wilson's conclusory assertion of this legal right is insufficient to state such a claim against Stallard here. See Morrison v. Garraghty, 239 F.3d 648 (4th Cir. 2001). In any event, inasmuch as Stallard's treatment of Wilson did not, in the end, inflict any deprivation of constitutional magnitude, he has no § 1983 claim against Stallard whatsoever.

[16] Wilson also appears to assert that Everidge conspired with Stallard to retaliate against Wilson for his lawsuits by planting the weapon in his cell. Without facts on which to prove that the individuals had an agreement or meeting of the minds to violate the plaintiff's rights, proof of independent acts by two or more wrongdoers do not support a conspiracy claim. Murdaugh Volkswagen v. First National Bank, 639 F.2d 1073, 1075-76 (4th Cir. 1981). In support of his conspiracy assertion, the only evidence to which Wilson points is the upside down name tags and the shakedown box left on the outside of Wilson's tray slot during cuff removal. These allegations of coincidental events fall far short of stating a plausible claim that Everidge or any of the other officers acted jointly with Stallard to frame Wilson with the planted knife. In any event, because Wilson has no § 1983 retaliation claim against Stallard related to the planted weapon, he also has no such claim against Everidge, even if he could offer evidence in support of a conspiracy between the two officers to effect this act.

authorities and local prosecutors did not pursue criminal charges against Stallard for planting the weapon did not deprive Wilson of any constitutional right.

Wilson also has no due process claim against Stallard. Inmates' federally protected liberty interests are "limited to the freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Wilson suffered no loss of liberty or any protected liberty interest as a result of Stallard's actions. Although prison officials brought disciplinary charges against Wilson and contemplated possible criminal charges against him as a result of the weapon allegedly found in his cell, no charges went forward, and no penalties were imposed. Procedural protections provided by the prison disciplinary procedures and by the internal investigations process operated to convince authorities to dismiss the disciplinary charges and forego any criminal charges against Wilson. Thus, Wilson received due process and suffered no deprivation of liberty because of Stallard's actions. The lack of criminal charges also precludes any claim of malicious prosecution or abuse of process actionable under § 1983. See, e.g., Albright v. Oliver, 510 U.S. 266, 274-75 (1994) (finding that allegations of malicious prosecution were not actionable under the Due Process Clause and stating in dicta that Fourth Amendment malicious prosecution claim would require showing that plaintiff was arrested on criminal charges that later terminated favorably to him).

Finally, Wilson asserts that he has claims of abuse of authority and malfeasance against Stallard. The officer's actions were clearly well outside his job duties and were contrary to established VDOC policies, as indicated by the fact that prison administrators disciplined

Stallard, once his actions became known. A state official's violation of the state's prison procedures, however, does not give rise to a federal claim actionable under § 1983. See Riccio v. County of Fairfax, Va., 907 F.2d 1459, 1469 (4th Cir.1990). To the extent that Wilson might have some cause of action against Stallard, based on his violations of VDOC regulations or other state law, such claims are not independently actionable under § 1983. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (finding that § 1983 was intended to protect only federal rights guaranteed by federal law and not tort claims for which there are adequate remedies under state law). Moreover, because the court herein dismisses all of Wilson's § 1983 claims, the court declines to exercise supplemental jurisdiction over any conceivable state law claims he may have raised in this action. See 28 U.S.C. § 1367(c). All such claims will be dismissed without prejudice accordingly, and for the stated reasons, Claim 1 will be dismissed in its entirety.

### B. Excessive Force

It is well established that "[a]fter incarceration, only the unnecessary and wanton infliction of pain on prisoners constitutes cruel and unusual punishment" in violation of the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 319 (1986) (internal quotations omitted). On the other hand, not every malevolent touch by a prison guard amounts to deprivation of constitutional rights. Hudson v. McMillian, 503 U.S. 1, 9 (1993).

> For an inmate to prove an excessive force claim, he must satisfy not only the subjective component that the correctional officers acted with a sufficiently culpable state of mind, but also the objective component that his alleged injury was sufficiently serious in relation to the need for force to establish constitutionally excessive force.

Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998). Plaintiff must prove that, subjectively, the force was applied "maliciously and sadistically for the very purpose of causing harm," rather

than "in a good faith effort to maintain or restore discipline." Id. (quoting Whitley, 475 U.S. at 320-21). This determination considers these factors: the amount of force used as related to the need for force, the threat reasonably perceived by the officers, and any attempts the officers made to "temper the severity of a forceful response." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

To prove the second component of his excessive force claim, the inmate "must show that correctional officers' actions, taken contextually, were 'objectively harmful enough' to offend 'contemporary standards of decency.'" Stanley, 134 F.3d at 634 (quoting Hudson, 503 U.S. at 8). This part of the analysis "evaluates the force applied and the seriousness of the resulting injury against the need for the use of force and the context in which that need arose." Id. Prison administrators are entitled to broad deference in determining what policies and practices are necessary to preserve or restore security and order. Id.

> Thus, when prison security measures are taken in response to an uprising or prison disturbance, the courts cannot always expect a perfectly measured response. "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense."

Id. (quoting Whitley, 475 U.S. at 326).

In short, the "core judicial inquiry [is] . . . the nature of the force—specifically, whether it was nontrivial and was applied . . . maliciously and sadistically to cause harm." Wilkins v. Gaddy, ___U.S.___, 130 S. Ct. 1175, 1179 (2010). The extent of the injury the inmate suffered is relevant to both of these determinations: as a factor in determining "whether use of force could

plausibly have been thought necessary in a particular situation" and as "some indication of the amount of force applied." Id. at 1178.

Wilson's description of Everidge's use of force against him on February 7, 2010 breaks the event into two parts: 1) Everidge's allegedly unprovoked act of clamping down on the right handcuff so that it dug painfully into Wilson's wrist, and 2) in response to Wilson's turning around to complain about that pain, Everidge's act of placing Wilson in a "wrist lock," causing a cut to Wilson's wrist.[17] Wilson fails to present evidence on which he could persuade the fact finder that the first of these actions was "objectively harmful enough to offend contemporary standards of decency" or that the second was anything other than a good faith effort to restore order. Stanley, 134 F.3d at 634 (internal quotations omitted).

Both of these acts occurred inside the shakedown box over Wilson's tray slot, which was inexplicably left on the door during cuffing procedures, when it would ordinarily have been removed. Wilson asserts that Everidge purposely left the box on the door to shield his planned, malicious assault on Wilson's wrist from the view of the video camera. However, other officers present at the shakedown on February 7, 2010, including the ranking officer, Sgt. Trapp, also failed to direct that the box be taken off the door before the cuffs were removed, and Wilson fails to allege facts indicating that these officers "knew" Everidge wanted to assault Wilson inside the

---

[17] Everidge brought a disciplinary charge against Wilson for assaulting him during the February 7, 2010 cuff removal procedure, based on Everidge's report that Wilson turned around and grabbed the officer's left wrist. (DE 1, p. 20.) Wilson denied grabbing Everidge's hand, and the disciplinary charge was dismissed. Therefore, to the extent that Wilson also seeks to sue Everidge for bringing a "false" disciplinary charge, he suffered no harm and so has no actionable claim on that ground.

box.[18] Moreover, the nature of the injuries inflicted does not corroborate Wilson's characterization of Everidge's actions as "malicious." As stated, the officer's initial squeeze of the cuff, while painful, did not even break the skin on the inmate's wrist. Some pain, even conceivably severe pain, from contact with metal handcuffs is the sort of injury that can easily occur when an officer accidently applies more pressure than usual or moves the cuff in an unexpected direction. Thus, the extent of the injury caused by Everidge's initial clamp down on the right handcuff does not support a finding that the use of force in this initial action was either malevolently applied or knowingly disproportionate to the circumstances.

After the initial squeeze on his right wrist, Wilson began yelling that the procedure was hurting him and turned around to face the officers. The act of turning around constituted a disruption to the well established cuffing procedure, during which the inmate is to remain with his back to the cell door until the cuffs are removed. Indeed, in a drawing submitted by Wilson in depiction of the incident, Wilson is pictured facing the cell door window, while the other officers involved in the procedure are shouting for him to "turn around." (DE 1, p. 4.) Wilson's disruptive behavior warranted some use of force to restrain the inmate until he resumed compliance with established procedures and to persuade him to do so. To these purposes, Everidge decided to utilize the "wrist lock." Even if, in hindsight, the amount of pressure applied in the wrist lock was not a "perfectly measured" response to the degree of threat that Wilson's actions posed, the court must defer to Everidge's determination that this hold was an

---

[18] Wilson asserts that the officers' upside down name tags somehow proves a conspiracy between them to allow Everidge's assault. This speculative evidence is insufficient to demonstrate any agreement among the officers so as to support the sort of conspiracy involvement to which Wilson alludes. See Murdaugh Volkswagen, 639 F.2d at 1075-76.

appropriate means of restoring order. Stanley, 134 F.3d at 634. Thus, the mere fact that Everidge's actions in response to an inmate's misbehavior caused the inmate pain, or even some injury, does not render his action, per se, cruel and unusual punishment.

On the contrary, the de minimis nature of the injury inflicted on Wilson's wrist by Everidge's use of the wrist lock indicates that this use of force was also de minimis. Wilkins, 130 S. Ct. at 1178. As discussed, the wrist lock caused a cut on the wrist, characterized by a medical professional as "small," and was treated with soap and water, a Band-Aid, and pain medication. Medical staff monitored the injury for a couple of days, noted some swelling and redness, and prescribed an antibiotic medication for a week. Wilson was examined a few days after the incident by the doctor, and X-rays are mentioned in the records. However, Wilson's submissions do not indicate that any further treatment was necessary, and he does not allege experiencing any broken bones or any other injury to his wrist, except the small cut in the skin, as a result of Everidge's actions. He does complain that his wrist is permanently scarred. The presence of a scar, five or six months after the injury, does not prove that the scar will be permanent or that the injury causing the scar was a serious one. This minor, temporary injury, resulting from the officer's necessary efforts to restore order after Wilson's disruption of the cuffing procedure, is clearly indicative that Everidge's application of the wrist lock was not malicious in the sense necessary for Wilson to state an excessive force claim. Whitley, 475 U.S. at 320-21. The court concludes that Claim 2 must be summarily dismissed, pursuant to § 1915A(b)(1).

## C. Deprivation of Property

Wilson's third claim concerns confiscation of excess publications from his cell. He complains that Stallard violated policy by merely removing and destroying these materials, without giving Wilson a confiscation notice and a chance to challenge the confiscation. Allegations that prison officials randomly deprived an inmate of his property, whether intentionally or as a result of negligence, do not state any constitutional claim "if a meaningful post-deprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984). Inasmuch as Wilson possessed tort remedies under Virginia state law to be reimbursed for the value of the destroyed publications, see Virginia Code § 8.01-195.3, it is clear that he cannot prevail in a constitutional claim for the alleged property loss in this case.[19] Accordingly, Claim 3 must be dismissed, pursuant to § 1915A(b)(1).

## D. Deliberate Indifference to Constitutional Violations

The court construes Wilson's fourth claim as alleging that supervisory prison officials knew from his past complaints that correctional officers at Wallens Ridge and Red Onion were carrying out a "campaign of harassment," and that these supervisors failed to respond reasonably to the risk that continuation of the campaign by their subordinates would result in deprivation of Wilson's constitutional rights. This claim fails on two levels.

---

[19] Wilson vaguely states that deprivation of the religious magazines violated his First Amendment rights. He fails to allege facts demonstrating that confiscation of these publications posed a substantial burden on his ability to practice his religious beliefs, however. Thus, his submissions fail to state a plausible claim for relief under the First Amendment. See Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 718 (1981).

The fact that Stallard failed to follow prison procedures allowing Wilson to appeal the confiscation states nothing more than a violation of state law, which is not actionable under § 1983, Wright, 766 F.2d at 849, and the court declines to exercise supplemental jurisdiction over such claims, pursuant to § 1367(c)(1).

Wilson may be attempting to impose supervisory liability on the Claim 4 defendants for the alleged constitutional violations committed by Stallard and Everidge or by other officers mentioned in Wilson's voluminous exhibits alleging retaliatory actions before or since the February 2010 incident. A higher ranking official may be liable under § 1983 for acts of his subordinates if (1) the official is actually or constructively aware of pervasive, unreasonable risk of harm from a specified source, (2) the official is deliberately indifferent to that risk, and (3) there exists an affirmative causal link between the supervisors inaction and the constitutional injury. Carter v. Morris, 164 F.3d 215, 221 (4th Cir.1999). Proof of deliberate indifference requires a showing that the official was aware of facts from which he could draw an inference that a substantial risk of harm existed, that he actually drew that inference, and that he disregarded the risk by failing to take "reasonable measures" to alleviate it. Farmer v. Brennan, 511 U.S. 825, 835-37 (1994). Wilson's claim of supervisory liability fails on both elements.

First, Wilson's submissions do not suggest that any of the defendants named in Claim 4 had any knowledge of facts on which they could have inferred that Wilson was at risk of suffering unconstitutional harm at the hands of Stallard and Everidge. Verbal threats these officers made two days before the February 7, 2010 shakedown concerned their claim that Wilson had placed bodily waste on his returned food tray. Thus, Wilson's reports of these threats did not put any supervisor on notice that Stallard or Everidge was likely to violate prison

policy in order to harm Wilson, as he alleges.[20]  Certainly, Wilson's many past complaints of

retaliation and harassment did not put officials on notice of a pervasive risk that Stallard and

Everidge, in particular, were likely to deprive Wilson of constitutionally protected rights.

Moreover, until Stallard's admission of retaliatory motive, Wilson's own assertions that officers

had taken adverse actions against him in retaliation for his exercise of constitutionally protected

rights, such as his pursuit of civil rights actions, are nothing more than speculation.[21]

Second, Wilson's own allegations indicate that the Claim 4 defendants have not ignored

his complaints of harassment and retaliation by correctional officers.  For nearly three years, at

two prisons, administrators have required correctional officers to videotape every incident in

which officers open Wilson's tray slot or remove him from, or return him to, his cell.  Clearly,

the purpose of this order, which places a high degree of inconvenience on the officers assigned to

Wilson's care, is to remind these officers, every day, to respect Wilson's rights or face the

likelihood that their actions will be evident from the videotape footage, and they will be

punished.  This preventative measure may not be foolproof,[22] but it is certainly a reasonable and

even aggressive technique designed to discourage guards (and inmates') misbehavior.

---

[20]  Verbal abuse, threats, and harassment by guards, without more, do not state any constitutional claim.  Henslee v. Lewis, 153 Fed. App'x 179, 179 (4th Cir. 2005) (citing Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979)); Pittsley v. Warish, 927 F.2d 3, 7 (1st Cir. 1991) (finding that a guard's verbal harassment or threats to an inmate, even if they cause an inmate fear or emotional anxiety, do not constitute an invasion of any identified liberty interest); Emmons v. McLaughlin, 874 F.2d 351, 354 (6th Cir. 1989) (verbal threats causing fear for plaintiff's life not an infringement of a constitutional right).

[21]  Wilson also asserts that officers have retaliated against him in various ways because of his utilization of the grievance procedures.  Because inmates have no constitutional right to a grievance procedure, however, adverse actions taken against an inmate in retaliation for his grievance activity does not state an actionable claim under § 1983.  See Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994).

[22]  Wilson claims that on several occasions, officers have neglected to videotape as the order requires.  He does not, however, claim that his rights were violated during any of those unrecorded incidents.

Wilson also submits copies of dozens of informal complaints, grievances, and appeals, with official responses indicating that the majority of his concerns were investigated and addressed. Indeed, an institutional investigator interviewed Wilson just two days before the incident at issue in this lawsuit. Stallard admitted his misconduct in the course of a VDOC internal investigation, which likely relied, in part, on the videotape footage of the February 7, 2010 shakedown. As a result of that investigation, Wilson's grievances about the planted weapon and the confiscation of his newspapers were deemed "founded," the disciplinary charges stemming from the incident were dismissed, no criminal charges were filed against Wilson, and Stallard was disciplined. This record does not support Wilson's allegations that the supervisory officials he names have not responded reasonably to his past complaints that officers have violated his constitutional rights. Thus, his evidence fails to support the deliberate indifference element of his claim.

Finally, for reasons discussed earlier in this opinion, Wilson fails to demonstrate that the Claim 4 defendants' actions or omissions "caused" him to suffer any deprivation of constitutionally protected rights. The court has already determined that Wilson's allegations in this lawsuit fail to state any constitutional claim against Stallard and Everidge, the subordinate officers involved in his current claims. Moreover, all of Wilson's past constitutional claims have either been dismissed for failure to satisfy the applicable constitutional standard or because jurors did not find in Wilson's favor after hearing all the evidence.

For the stated reasons, the court concludes that Claim 4 fails to state any constitutional claim actionable under § 1983. Therefore, this claim will be dismissed, pursuant to § 1915A(b)(1).

## E. Other Pending Motions

Wilson has moved for interlocutory injunctive relief, directing that he be housed in an area of the prison away from Defendant Everidge, who allegedly "threatened" him soon after he filed this action. Wilson states that he is afraid to leave his cell, for fear that Everidge or other officers will place contraband in his cell in order to cause him to be charged with wrongdoing that will result in a longer term of confinement.

Because interlocutory injunctive relief is an extraordinary remedy, the party seeking such relief must make a clear showing "(1) that he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) an injunction is in the public interest." Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 346-47 (4th Cir. 2009) (quoting Winter v. Natural Resources Defense Council, Inc., ___ U.S. ___, 129 S. Ct. 365 (2008)). Each of these four factors must be satisfied before interlocutory injunctive relief is warranted. Id. at 347.

Wilson's allegations in his motion for interlocutory injunctive relief are simply too vague and speculative to support issuance of the order he seeks. He does not state the specific nature of the "threats" that Everidge allegedly made against him, nor does he offer any evidence whatsoever that he will suffer irreparable harm in any form in the absence of the requested relief. Therefore, he fails to satisfy the required elements under the Winter decision, id., and his motion (DE 30) must be denied accordingly.

Wilson also moves for a psychological evaluation, pursuant to Rule 706 of the Federal Rules of Evidence. He states that as an indigent inmate, he will need evidence from a psychological professional to support his claims that defendants' actions have caused him to

suffer mental trauma and distress.[23] He asks the court to convince a "freelance" professional, not associated with the VDOC or law enforcement, to donate these services to assist Wilson in preparing evidence in support of his lawsuit. Inasmuch as his lawsuit will be dismissed for the reasons stated, his motion for a psychological examination (DE 31) will also be denied.

### Conclusion

For the stated reasons, the court concludes that Wilson's claims under § 1983 must be dismissed, pursuant to § 1915A(b)(1), and that any state law claims must be dismissed without prejudice, pursuant to § 1367(c)(1). An appropriate order will issue this day.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this memorandum opinion and the accompanying order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff.

ENTER: This 19th day of August, 2010.

_____

Chief United States District Judge

---

[23] Wilson asserts that when he asked about getting mental health therapy to help him deal with the mental distress he has allegedly suffered as a result of defendants' actions, he was told that he could request an appointment with the Red Onion psychologist, who could prescribe "psychotropic medications" for him. He was told, however, that Red Onion does not offer any other form of "mental health therapy" for mental health issues. He has not raised a claim in this action, however, that officials have acted with deliberate indifference to his mental health needs.